# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 27, 2004

## STATE OF TENNESSEE v. JACOB EDWARD CAMPBELL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-B-896      J. Randall Wyatt, Jr., Judge**

---

**No. M2003-00597-CCA-R3-CD - Filed March 15, 2004**

---

A Davidson County jury convicted the Defendant, Jacob Edward Campbell, of premeditated first degree murder, felony murder, and robbery, and the trial court merged the two murder convictions into a single offense of first degree murder. Thereafter, the jury sentenced the Defendant to life imprisonment with the possibility of parole for first degree murder, and the trial court imposed a ten-year sentence for the robbery conviction to be served consecutively to the Defendant's life sentence. On appeal, the Defendant contends that: (1) the evidence was insufficient to support his convictions; (2) the trial court erred by admitting into evidence crime scene photographs of the murder victim; (3) the trial court erred by admitting into evidence testimony regarding pills found on the Defendant when he was arrested; (4) the trial court erred by allowing a State's witness to read to the jury a summary of the witness's pre-trial statement to police; (5) the trial court erred by denying the Defendant's request to introduce a prior recorded statement of an unavailable witness to impeach a State's witness; (6) the trial court erred by not clarifying its jury charge that the jury could not consider evidence introduced at trial concerning the co-defendant; and (7) the trial court erred by ordering that the sentence for robbery run consecutively to the Defendant's life sentence. Finding no reversible error, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

David M. Hopkins, Nashville, Tennessee (on appeal) and James L. Weatherly, Nashville, Tennessee (at trial) for the appellant, Jacob Edward Campbell.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Dan Hamm and Katrin Miller, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**Opinion**
**I. Facts**

This case involves the death of eighty-two year old William Satterfield, whose body was found in the basement of his east Nashville home on July 17, 2000, after intruders bound his hands and ankles with a telephone cord and duct tape, stuffed his mouth with a wad of paper towels, taped his mouth with duct tape, placed a plastic grocery bag over his head and sealed the bag around his neck with duct tape. The intruders stole the victim's car, guns, jewelry and other items from his home. The Davidson County Grand Jury indicted the Defendant, Jacob Edward Campbell, for premeditated first degree murder, felony murder and robbery for the crimes committed against the victim.

The following evidence was presented at the Defendant's trial. Tony Roberts testified that he was a good friend of the victim and often drove the victim on errands. Roberts stated that the victim lived at 1139 Shelton Avenue in Nashville and had just turned eighty-two when he was killed. He stated that the victim paid cash for a new white Oldsmobile in 1999, but did not drive the car. He testified that, despite being eighty-two years old, the victim was "an independent gentleman" and tried to take care of himself, though he received some assistance from the "Meals on Wheels" program. Roberts explained that the victim did not trust banks to keep his money and often spoke of keeping large amounts of cash in his home.

Roberts testified that on July 18, 2000, he called the victim's house to check on the victim, but the victim did not answer the phone. Roberts stated that he drove to the victim's house around 2:30 p.m. and noticed "there was some cushions sitting on his front porch and his car was gone," which was unusual. Roberts stated that he thought that the victim may have gone to the store, so he waited for the victim on the front porch. He explained that, after an hour, he walked across the street and talked to some neighbors to see if they had seen the victim, but they had not. Roberts then called Robert Adcock, who was a friend of the victim and lived one street over, and asked him to come over to the victim's house. Roberts stated that he and Adcock decided to check inside the victim's house, and, as they approached the door, they noticed that it was unlocked and partially open. Roberts explained that the house "was in total disarray. Furniture was upside down . . . [a]nd it was just in shambles, things knocked over . . . just trashed through." Roberts stated that he immediately called 9-1-1, and the police came to the victim's house. He stated that he gave police a description of the victim's white Oldsmobile.

Roberts testified that he knew the Defendant because the Defendant was Adcock's grandson and would often mow the victim's grass. He stated that the victim kept two shotguns in one corner of his house, two handguns in his recliner, and one handgun under his pillow in his bedroom. Roberts testified that he and the victim wrote down the serial numbers of the guns "for record keeping sake, for safety." Roberts identified two guns that were introduced by the State as belonging to the victim. Roberts testified that the victim had some jewelry, including some rings and several pocket watches.

Paul Sharp, an officer with the Metropolitan Police Department, testified that he responded to a 9-1-1 call at 1139 Shelton Avenue in the Englewood section of east Nashville on July 18, 2000, at 5:03 p.m. Officer Sharp stated that he spoke with Roberts and Adcock and then entered the victim's home. The officer said that there were no signs of forced entry to the front door, but "it was obvious some ransacking had taken place." The officer testified that he found two rolls of duct tape on the bed in a bedroom and discovered that the phone cord in that room had been ripped from the phone. Officer Sharp stated that, after talking with Roberts and Adcock about the victim's guns and valuables, he and another officer made a further inspection of the victim's home and discovered that the intruders had taken the victim's guns, jewelry, car and cash. The officer explained that he and the other officer went to the basement, which had a dirt floor, but did not see anything disturbed. He stated that he and the other officer left their footprints in the dirt floor as they inspected the basement. Officer Sharp testified that he assumed that a serious crime had been committed, so he notified the Homicide Division, the Burglary Division and the Identification Division of the Metropolitan Police Department. He stated that he had the police dispatchers request that police officers stop and pick up the victim or his vehicle.

Jeff West, a detective with the Homicide Division of the Metropolitan Police Department, testified that he investigated the disappearance of the victim on July 18, 2000. He stated that, after talking with Officer Sharp and the other officers at the scene, he conducted a thorough search of the house, starting on the second floor and working his way to the basement. The detective testified that he found the victim's body in the basement. On cross-examination, Detective West stated that it was obvious that the victim's body had been placed in the basement and not thrown down the stairs. He explained that the victim's hands and ankles were tied with a telephone cord and taped with duct tape. Detective West testified that there was a plastic Kroger shopping bag over the victim's head, which was taped to the victim's neck with duct tape.

Earl Douglas Hunter, an officer with the Identification Division of the Metropolitan Police Department, testified that he arrived at 1139 Shelton Avenue at approximately 6:40 p.m. on July 18, 2000. Officer Hunter stated that he noticed that a phone cord, without a phone attached, was lying on the floor in the living room and one "house shoe" was on the dining room floor. The officer stated that a "chew" of tobacco had been spit out on the dining room table, and a bag full of Kroger plastic bags was on the kitchen floor, with one or two bags pulled out. The officer stated, in one bedroom, he discovered that several drawers had been dumped out and that many items were on the floor. He stated that he and another officer entered the back bedroom and found two rolls of duct tape on the bed and a phone, with no cord attached, on the bed. Officer Hunter testified that he found the victim's body in the basement under an egg-crate foam mattress. The officer stated that he felt the victim's feet and discovered that they were cold and noticed that the victim's leg was stiff, indicating that his body was in rigor mortis. The officer explained that they lifted the mattress off the victim and discovered that the victim's head was covered with two plastic Kroger bags and his hands were tied behind him. Officer Hunter testified that they called for the medical examiner to examine the victim's body. The officer identified several photographs he took of the house and of the victim.

On cross-examination, Officer Hunter testified that he processed many items in the victim's house for latent fingerprints, including items on the floor of the house. He stated that he also took six sets of shoe impressions to eliminate the six patrol officers that had walked through the crime scene. The officer explained that he found some tennis shoe prints in the house and lifted those shoe prints from the floor using black powder and four-inch tape. Officer Hunter stated that he believed the victim's body had been in the basement for at least twelve hours, based upon the body's condition. The officer explained that no blood samples or hair samples were taken at the crime scene and no carpet fibers or clothing fibers were found.

William Kirby, an officer with the Identification Division of the Metropolitan Police Department, testified that he processed the crime scene along with Officer Hunter by taking photographs, some of which the State offered into evidence, and by making a diagram of the crime scene. Officer Kirby testified that in order to get a more detailed photograph of the victim's face, an assistant medical examiner lifted up the grocery bag from the victim's face. He explained that, underneath the plastic grocery bags on the victim's head, he and the assistant medical examiner noticed that the victim's mouth was taped with duct tape. Officer Kirby stated that, "when we pulled off the duct tape, the wad of paper towels came out of the mouth." The Defendant objected to the introduction of the photographs of the victim's body contending that they were unfairly prejudicial, but the trial court overruled the objection. The officer stated that he believed that the victim's ankles and hands were tied with the telephone cord taken from the upstairs bedroom.

Nora Campbell, the Defendant's sister, testified that on July 17, 2000, the Defendant came to her home at about 10:30 p.m. with Jarret Guy, his wife Angela Guy, and the Guys' newborn child. She explained that the Defendant asked her whether he and the Guy family could spend the night at her home, and she agreed. Campbell stated that the Defendant and Jarret Guy paid her $100 cash to spend the night. She testified that she told the Defendant and the Guy family that they had to leave the next day before her boyfriend came to help her move. Campbell stated that the Defendant and the Guy family arrived at her home in a new white car that she did not recognize. After viewing a photograph of the victim's car, Campbell testified that the victim's car was the one in which the Defendant and the Guy family arrived. Campbell stated that she was told that the car belonged to Jarret Guy's brother-in-law. She testified that, while the Defendant and the Guy family were in her home, she found several guns and some jewelry that did not belong to her under her kitchen sink. Campbell stated that she asked who owned the guns and jewelry, "But there was nothing else said about it." She explained that after the Defendant and the Guy family left, the items under the sink were gone. She identified photographs of the victim's guns and jewelry as being photographs of the items she found under the sink. She stated that the Defendant and Jarret Guy also brought prescription drugs into her house, and she believed the drugs were "Mepergan and either Xanax or Valium." She stated that the Defendant and the Guy family left her home on the morning of July 18, 2000.

Campbell testified that, after the Defendant and the Guy family left, Jarret Guy dropped the Defendant back off at her house later that afternoon. She stated that she drove the Defendant over to her friend Barbara Hale's house and dropped him off. She explained that, while they were in the

-4-

car driving to her friend's house, the Defendant "just stated that something bad had happened. And he said he loved me . . . ." Campbell stated that she asked the Defendant, "'well, you haven't killed anybody, have you?' And the conversation pretty much dropped from there." Campbell testified that the Defendant lived with their grandparents, Robert Adcock and Ruby Adcock, in east Nashville, and, after dropping off the Defendant, she drove to her grandparents house to get the Defendant some clothes at his request. After getting the Defendant the clothes, she stated that she picked up the Defendant from Hale's house and drove him to the Super 8 Motel in Goodlettsville at 12:00 a.m. on July 19, 2000.

On cross-examination, Campbell testified that during the night of July 17, 2000, and the early morning of July 18, 2000, Jarret Guy went to the white car and retrieved some "crack" cocaine. She stated that everyone, including herself, used the "crack" cocaine throughout the night, and none of them went to sleep.

Charles McEwen, Sr., testified that, on July 17, 2000, Jarret Guy and the Defendant came to his house and tried to sell him two shotguns. McEwen, Sr., stated that they arrived at his house in a white car, and he confirmed that the car he observed was the same as the photograph of the victim's car. He testified that he did not buy the guns because he did not have any money at that time, but allowed Jarret Guy and the Defendant to store the shotguns in the loft above his garage. McEwen, Sr., said that the two men told him that they would pick the guns up later. McEwen, Sr., identified photographs of the victim's shotguns and the shotguns themselves as the shotguns the two men tried to sell him. McEwen, Sr., testified that Jarret Guy and the Defendant never retrieved the guns. He stated that a police officer came to his house and asked him whether he knew Jarret Guy and the Defendant, and he initially denied knowing them. McEwen, Sr., testified that, after the officer told him what had happened to the victim, he admitted that he knew Jarret Guy and the Defendant and told the officer about the shotguns located in his garage. On cross-examination, McEwen, Sr., stated that he did not think the shotguns were stolen at the time of the attempted sale.

Charles McEwen, Jr., testified that he was at home with his father McEwen, Sr., on July 17, 2000, when Jarret Guy and the Defendant came to their house. He explained that he had known Jarret Guy for several months, but he had only met the Defendant once before July 17, 2000. He stated that the two men arrived at his father's house in a white car, with Jarret Guy driving and the Defendant in the passenger seat. McEwen, Jr., stated that the Defendant and Jarret Guy got out of the car and started talking with his father. He explained that Jarret Guy had two pistols tucked visibly into his pants, and the Defendant had one pistol tucked into his pants. He stated that Jarret Guy had two shotguns and "[a]sked my father [if he] would . . . hold them for a couple of hours, that he was coming back to get them." McEwen, Jr., stated that his father agreed to hold the guns and told the men to place the guns in the loft above the garage. He identified photographs of the guns and confirmed that they were the shotguns the men attempted to sell to his father. McEwen, Jr., testified that the Defendant and Jarret Guy never returned to retrieve the shotguns.

Angela Danielle Guy, Jarret Guy's wife, testified that, in July of 2000, she and her husband lived in east Nashville with their five-month old daughter. Angela Guy stated that their daughter

was born prematurely and, therefore, required a special monitor and oxygen. She testified that, on July 15, 2000, she heard a conversation between her husband and the Defendant at their apartment "about making some money," and the Defendant "mentioned that he knew where to make some money. A friend of his grandfather's kept large sums of money because he didn't believe in banks. . . . He mentioned that he was an old man." Angela Guy testified that the Defendant stated that the victim lived in the Englewood area near a Kroger's grocery store. She stated that the Defendant told her husband that the victim had "anywhere from twenty-five to fifty thousand dollars. It was a large sum." She said that the Defendant stated that the victim would go grocery shopping every Monday and "that he usually stayed gone about three hours." Angela Guy testified that, on Monday July 16, 2000, the Defendant came to their apartment in mid-morning and visited with her husband for about two hours. She explained, "They [were] just talking about [how] they were going to hang out that day . . . ." She stated that the Defendant and her husband left, and she thought they were going over to the Defendant's home. Angela Guy testified that at about 3:00 or 4:00 p.m. on July 16, 2000, "Jarret [Guy] called and said he was going to go to Kroger's. . . . That meant that they were going to go break into the house."

Angela Guy testified that her husband called her again a few hours later and told her to lock the front door. She stated that, about five minutes after the phone call, Jarret Guy drove up to the house in a new white Oldsmobile that she had never seen before with the Defendant in the passenger seat. She identified a photograph of the victim's car as the same car that Jarret Guy and the Defendant were driving. She explained, "As soon as I had opened the door, they came in. They kept running back and forth to the car, getting property out of the car. . . . It was merchandise from the house." Angela Guy stated that the Defendant and Jarret Guy carried in guns, some cash and change, shotgun shells, bullets and pills, including some nitroglycerine pills. She recognized photographs of the victim's guns as the guns that Jarret Guy and the Defendant brought back from the victim's house. Angela Guy also recognized a black bag containing some loose change and a few pieces of jewelry, including a watch, that the Defendant and Jarret Guy brought into her house. Angela Guy testified that the Defendant and Jarret Guy told her that the white Oldsmobile was the Defendant's aunt's or cousin's car, but she did not believe them.

Angela Guy testified that, once her husband and the Defendant came into the house, "[t]hey started going through things, sorting things out, seeing what was worth money and what wasn't worth money, throwing things away that weren't . . . valuable. And then they [were] discussing . . . how much they [were] going to sell this for, how much they were going to sell that for." She stated that the Defendant and her husband were looking at some pocket watches on the bed and discussing which ones "were worth some money." She explained that the Defendant and Jarret Guy had "a lot" of cash, but she did not ask about it "[b]ecause everything was happening so quickly." Angela Guy testified that Jarret Guy counted the cash and then gave the Defendant "his half of the money," but she did not know how much. She explained that Jarret Guy "told two different stories" about how much money he got, telling her that he got $400 one time and $900 another time. Angela Guy stated that her husband "was running around, running past me," and the Defendant and Jarret Guy were acting "real[ly] nervous." She said that Jarret Guy "even went to the restroom and got sick." She explained that the Defendant and Jarret Guy were sweating and appeared to be out of breath.

-6-

Angela Guy stated that the two men left the house with two shotguns, some shotgun shells, some pills and cash. She stated that she did not accompany the Defendant and her husband when they left to sell the shotguns, but she explained that her husband told her "to get the baby's things together because we were leaving once he got back." Angela Guy testified that they were gone for about an hour and a half and then returned to the house in the early evening. She said that they stayed at the house for about forty-five minutes so she could get the baby's equipment ready to go. She explained that she, the baby, her husband and the Defendant got into the white Oldsmobile, and Jarret Guy drove them to Nora Campbell's house, who was not at home when they arrived. She explained that the Defendant and Jarret Guy went to the back of the house and entered. She stated that Campbell arrived at her house shortly thereafter, and the Defendant and Jarret Guy each paid Campbell some money to spend the night at her house.

Angela Guy stated that she, the baby, Jarret Guy and the Defendant left the next day, July 18, 2000, in the white Oldsmobile, and Jarret Guy drove them to the Super 8 Motel in Goodlettsville where they got one room. She said that she thought that Jarret Guy checked them into the motel. She explained that the Defendant and Jarret Guy brought the jewelry, the pills, two pistols, some shotgun shells and some cash into the motel room. Angela Guy said that, at some point, Campbell came to the motel room and gave the Defendant some clothes. She stated that, after they had been in the room a few hours, the police came to the motel room at about 2:00 or 3:00 a.m. on July 19, 2000. She explained that Jarret Guy was in the white Oldsmobile when the police arrived because she asked him to retrieve something for the baby. Angela Guy testified that the police "started beating on the door. And I told them just to hold on a second, because [the Defendant] had a gun. And they asked me if anybody was armed. And I told them to hang on a second. And I was trying to talk to [the Defendant]." She said that the Defendant told her to get in the bathtub with the baby. She explained that, while she was talking to police, "[the Defendant] had managed to get the . . . mattress up. And he had climbed underneath, in between the mattress and . . . up under the box springs." She testified that it was obvious the Defendant was under the box springs because the mattress was over to the side. She explained, "And the police officer asked me . . . to cooperate and tell me if anyone else was inside the room. And I told him that [the Defendant] was in the room." Angela Guy stated that the police then arrested the Defendant at the motel room. She stated that the police found the pistols, crack cocaine, prescription drugs and the jewelry in the motel room. She explained that Jarret Guy and the Defendant purchased the crack cocaine while they were staying at Campbell's house.

On cross-examination, Angela Guy testified that she had convictions for criminal impersonation and shoplifting, and she was recently arrested for unlawful use of a motor vehicle. She stated that she was a drug user in the past, but she was participating in rehabilitation programs. She explained that in July of 2000 she was using "crack" cocaine on a regular basis. She said that she smoked "crack" cocaine when she was pregnant and continued to smoke it after the baby was born. Angela Guy testified that Jarret Guy was also a habitual "crack" cocaine user. She said that neither she nor her husband worked. She explained that she spent at least $20 a day on "crack" cocaine in 2000 and borrowed money from family and friends to support her habit.

Angela Guy stated that Jarret Guy would commit burglaries and then sell the stolen goods in order to raise money to buy "crack" cocaine. She said that she never accompanied Jarret Guy when he committed burglaries. Angela Guy testified that, on July 15, 2000, the Defendant and Jarret Guy attempted to recruit Brian Bryant to participate in the robbery of the victim, but Bryant refused to participate in the robbery. She denied telling Jarret Guy that "Brian Bryant was weak, that he wouldn't be back." Angela Guy explained that the Defendant told Jarret Guy that the victim's house was near Kroger's grocery store in the Englewood area of east Nashville. She stated that the Defendant never drove the white Oldsmobile, rather Jarret Guy drove it, and the Defendant rode with him. She admitted that Jarret Guy had stolen cars before, and she thought that he had stolen the white Oldsmobile when he pulled up to the house in it. Angela Guy testified that she told her husband to remove the items from the house after he brought them inside. She stated that she has not been charged with any crimes related to the robbery and murder of the victim.

Mike Singleton testified that he was a caregiver for the victim before he was murdered. He stated that the victim had a hernia operation in the summer of 1999, so he stayed with the victim at the victim's house and cared for him until after Christmas of 1999. Singleton stated that his fingerprints would be in the victim's house because of his extended stay at the house in 1999. On cross-examination, Singleton testified that the victim did not have "a whole lot of company." He stated that the victim had a habit of sitting on his front porch and talking with his neighbors, and the victim would not hesitate to talk with strangers that came by his house.

Grant Carroll, an officer with the Metropolitan Police Department, testified that he was patrolling the east sector of Nashville on July 19, 2000, when he heard the dispatcher asking officers to "be on the lookout" for a stolen white car that was connected to a murder. The officer stated that the alert gave the tag number and told officers that two white men and a white woman may be with the stolen car. Officer Carroll stated that he wrote the stolen car's tag number down and began actively looking for the new white Oldsmobile. The officer explained that he "started looking in . . . motel parking lots in the Goodlettsville area." Officer Carroll testified that he spotted the stolen car in the parking lot of the Super 8 Motel, so he reported that he found a vehicle and requested backup. He stated that the car was occupied by a white man who appeared to be asleep. The officer testified that he and some other officers drove around the corner of the building, exited their vehicles and approached the white Oldsmobile. He explained that the man, who was later identified as Jarret Guy, exited the car and turned toward the officers, so the officers drew their weapons and ordered Jarret Guy to turn around and put his hands behind his back. Officer Carroll testified that he took the Super 8 Motel room cards from Jarret Guy, and the motel office scanned the cards and determined that the cards were for room 156. The officer stated that he and the other officers went to room 156, knocked on the door, announced that they were police officers and requested that the occupants voluntarily talk with them. The officer explained that a white woman came to the door holding a baby, and then they found the Defendant standing by a bed in the room. The officer stated that the Defendant was taken into custody and placed in the back of his patrol car. On cross-examination, the officer stated that the Defendant was not hiding in the room and was not carrying any weapons when he was taken into custody.

Jerry Hutchinson, an officer with the Metropolitan Police Department, testified that he, and another officer in his patrol car, responded to a call from Officer Carroll requesting backup at the Super 8 Motel in Goodlettsville on July 19, 2000, because the officer had located the stolen white Oldsmobile. Officer Hutchinson stated that, once he and the other officers entered the Defendant's motel room, he frisked the Defendant before placing him under arrest. The officer explained that he found some red pills in the Defendant's left front pocket. The Defendant objected to the introduction of the pills into evidence, but the trial court overruled the objection. On cross-examination, the officer stated that no weapons were found on the Defendant at the time of his arrest.

Johnny Lawrence, an officer with the Identification Division of the Metropolitan Police Department, testified that he assisted another officer in processing the scene at the Super 8 Motel in Goodlettsville at around 4:30 a.m. on July 19, 2000. Officer Lawrence testified that he helped to locate and collect evidence in motel room 156, and he described photographs taken of the motel room. The officer stated that they found a folded towel containing jewelry on the bed, a stainless steel plated handgun with pearl handles on it and six bullets next to it hidden under the mattress, and a blue-steel handgun with six bullets in it under a pillow on the bed. The State then showed the officer the victim's handguns, and he confirmed that they were the handguns found in the motel room. The officer confirmed that they found four Elgin pocket watches, several wrist watches, and two gold rings in the motel room. On cross-examination, Officer Lawrence testified that he did not process the jewelry found at the scene for fingerprints and did not know if any other officers did so. The officer stated that they also found some clothing, a cell phone and a cell phone charger.

Andrew Parker, a prisoner at Turney Center Prison, testified that he was serving five years at thirty percent for burglaries and theft. Parker stated that he was in the Criminal Justice Center in Nashville on July 19, 2000, because he had just been arrested for stealing a car. He explained that he met the Defendant at the Criminal Justice Center on July 19, 2000, and stayed with him for two to three days as his cell-mate. Parker testified that the Defendant told him that he had been arrested for murder and then told him what had happened. He explained that the Defendant told him "[t]hat they had [gone] to rob someone. And they robbed them. And they killed him and took his car." Parker stated that the Defendant told him that the victim was "[a] friend of his grandfather's that he had known while he was growing up." He said that the Defendant told him that he cut the victim's grass. Parker explained that the Defendant said, "I broke that old man's neck," and demonstrated breaking the victim's neck by making a twisting movement with his two hands going in the opposite direction. Parker stated that the Defendant did not tell him who his accomplice was in the murder. He explained, "[The Defendant] said something about a plastic bag being put over his head or something like that. And there was mention of tape, duct tape. And if I'm not mistaken, he said he threw him down the stairs into a basement, or something like that." Parker testified that the Defendant also mentioned Jarret Guy was with him at the time of the murder. He stated that the Defendant told him that they selected the victim "[b]ecause they knew him. There was supposed to have been quite a bit of money and some pills, pain medication." Parker testified that the Defendant told him that, after they killed the victim, "they went to a motel room and were doing drugs until they got caught." Parker said that the Defendant told him that they got some money, prescription drugs and the car from the victim. He stated that the Defendant described the car as a new Oldsmobile

Cutlass or a Chevy Malibu. Parker testified that during the three days he spent with the Defendant, the Defendant did not show any remorse for what he did. Parker stated that he told police about the Defendant's confession to him about a month later, and nobody promised him anything for his testimony.

On cross-examination, Parker testified that, at the time of his arrest, he was drunk from drinking a pint of Johnny Walker whisky and had taken some Valium. Parker stated that he told the police officers that he was suicidal, so the officers put him in the medical ward of the Criminal Justice Center. Parker explained that he talked with the Defendant after they woke up in the cell together. Parker stated that prosecutors showed him his statement to police that he made in 2000 regarding the Defendant's confession "a couple of hours" before he testified. The Defendant presented Parker with a copy of his statement and asked him whether that was the document he reviewed, and Parker responded affirmatively. He stated that he hoped that he could avoid going to prison by telling police about the Defendant's confession to him while they were cell mates. Parker said that he contacted his attorney before talking with police about the Defendant's confession to find out if he could get a reduced sentence. On re-direct examination, the State asked Parker to read the statement that he previously gave to police in 2000. The Defendant objected to Parker reading the statement into evidence, but the trial court overruled the objection. Parker read the following statement:

> According to Mr. Parker, [the Defendant] told him, while in jail, about a crime he had committed. He stated that [the Defendant] stated that he and a friend went over to one of his grandfather['s] friend['s] house that he used to cut grass for when he was a kid, and robbed him for money and drugs. He stated, '[the Defendant] said that they knocked on the [door] and asked to use the phone, then tied him up.' He stated that [the Defendant] had told him that he broke the old man['s] neck and then demonstrated it to him. And he stated that [the Defendant] mentioned the plastic bag to him and went outside and told his friend that he put the old man in a closet. [The Defendant] told him that they took the old man['s] car, which was a new Cutlass. He stated that [the Defendant] told him that while they were in the house the other guy told [the Defendant] to let the old man go. And [the Defendant] pulled a thirty-eight (.38) caliber on him. He also had a blue-steel, thirty-eight (.38) caliber. See tapes for more details of Mr. Parker's interview.

Parker testified that the statement was accurate and that he remembered the Defendant telling him about the murder of the victim.

Danny Morris, Police Identification Supervisor of the Metropolitan Police Department, testified as an expert in fingerprint comparisons. Morris stated that none of the prints lifted in the victim's house matched the fingerprints of the Defendant or Jarret Guy, and the print lifted from one of the shotguns was of no value for comparison purposes. On cross-examination, Morris stated that the pocket watches found in the motel room should have been processed for fingerprints, in his opinion.

Derry Baltimore, a detective with the Homicide Division of the Metropolitan Police Department, testified that he investigated the murder of the victim on July 18, 2000. Detective Baltimore stated that he arrived at the victim's house in the afternoon and found that the crime scene had been secured by the patrol officers. He said that officers from the Identification Division were processing the inside of the house by taking photographs, looking for latent prints and "trying to figure out who else may have been in the house." Detective Baltimore stated that he examined the victim's body and found that there was a plastic bag around the victim's head that was duct taped to his neck, and "he was tied up with phone cord, had a few abrasions upon the head and the side." The detective explained that the medical examiner removed the plastic bag, duct tape and the telephone cord. He stated that, when he was notified that officers found the stolen white Oldsmobile at the Super 8 Motel in Goodlettsville, he drove to that location and found the Defendant, Jarret Guy and Angela Guy already in custody. The detective testified that he interviewed Angela Guy at the police station, and she gave a statement.

Detective Baltimore testified that he and another detective interviewed Andrew Parker on August 23, 2000, regarding the victim's murder. He stated that he did not make any promises to Parker regarding a possible reduced sentence in exchange for his information. On cross-examination, the detective stated that he agreed to speak to the assistant district attorney on Parker's case to inform him of Parker's cooperation. Detective Baltimore testified that many of the victim's belongings were found at the home of Jarret Guy and Angela Guy and at the Super 8 Motel room registered to Jarret Guy. The detective explained that he did not order any type of trace evidence examination of anything taken from the victim's house. He stated that there was no hair sample, blood sample or latent fingerprint that connected the Defendant to the victim's home. Detective Baltimore said that he decided not to order any fingerprints from the victim's jewelry recovered from the motel room.

Dr. Bruce Phillip Levy, Chief Medical Examiner for the State of Tennessee and Metropolitan Nashville Government, testified in a video deposition as an expert in forensic pathology. Dr. Levy testified that he performed an autopsy on the victim, William Gordon Satterfield, and found that the victim had not ingested any alcohol or other drugs. The doctor explained that, based upon his examination, the victim died sometime on the afternoon of July 17, 2000. Dr. Levy stated that the victim "died as a result of both manual strangulation and suffocation," and the doctor ruled the victim's death as a homicide. He explained that the source of the suffocation was a plastic bag that had been duct taped over the victim's head. The doctor stated that the victim had a variety of blunt force injuries on his head, portions of his chest, abdomen, back, arms and legs. He explained that the victim's injuries were caused by the victim being struck by an object or the victim being thrown down and striking the object. Dr. Levy testified that the victim was "strangled by somebody or some number of persons' hands that were placed around his neck and applied pressure, causing his death." He stated that the victim had several bruises and lacerations on his face and the back of his head, which was consistent with the victim struggling with his attackers and possibly being pushed or dragged down a flight of stairs. Dr. Levy explained that the abrasions and bruises on the victim's arms were consistent with the victim putting up his arms in a defensive position to ward off blows from his attackers. The doctor stated that the manual strangulation occurred before the plastic bag

was placed over the victim's head and duct taped to the victim's neck, though he did not know which act actually killed the victim in this case.

On cross-examination, Dr. Levy testified that the victim "was thin and somewhat frail" at the time of his death, though the victim was in good health for an eighty-two year old man. The doctor stated that the victim had no broken bones in his body and that the victim's neck was not broken. He explained that the time of the victim's death would have been between 1:00 a.m. on July 17, 2000, and 1:00 a.m. on July 18, 2000. Dr. Levy stated that he could not tell from the victim's body whether the victim's attacker was right or left handed. After the presentation of this evidence, the State rested.

The Defendant attempted to introduce a video of a police interview with Brian Bryant, the man that Angela Guy said the Defendant and Jarret Guy attempted to recruit to participate in the robbery of the victim. The Defendant's investigator could not locate Bryant and therefore could not subpoena him to testify at trial. The Defendant claimed that the video would show Bryant contradicting Angela Guy's testimony because Bryant told police that Angela Guy called him weak and not up to the task of robbing the victim and said that he would not be back. The Defendant also claimed that Bryant told police that the Defendant did not speak while Jarret Guy was attempting to recruit Bryant. The trial court denied the Defendant's request to introduce the video of the police interview with Bryant because it did not fall within any hearsay exception and the Defendant cross-examined Angela Guy on this very issue. Thereafter, the Defendant introduced the video as an offer of proof.

The Defendant then called William Stewart, a detective with the Robbery Division of the Metropolitan Police Department, to testify. Detective Stewart testified that he investigated the armed robbery of Clarence McDowell, an elderly man, on July 13, 2000. The detective stated that the suspect in that robbery was Jarret Guy. He explained that the robbery occurred in McDowell's house, and the robber tied up McDowell with a phone cord and stuffed a sock in his mouth. Detective Stewart stated that the robber took some jewelry, some household goods and his car. He stated that McDowell picked Jarret Guy out of a photo line-up, so Jarret Guy became the prime suspect for the crime. The detective testified that he interviewed Jarret Guy after he was arrested for the murder and robbery of the victim in this case, and he admitted to robbing McDowell. Detective Stewart explained that Jarret Guy confessed to the McDowell robbery after giving a statement to detectives about the murder of the victim in this case. The detective stated that Jarret Guy admitted to leaving McDowell bound and gagged but did not harm him.

After the three day trial, a Davidson County jury convicted the Defendant of premeditated first degree murder, felony murder and robbery, and the trial court merged the two murder convictions into a single offense of first degree murder. The jury sentenced the Defendant to life imprisonment with the possibility of parole for the first degree murder conviction, and the trial court imposed a ten year sentence for robbery to be served consecutively to the Defendant's life sentence. The Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence was insufficient to support his convictions; (2) the trial court erred by admitting into evidence crime scene photographs of the victim; (3) the trial court erred by admitting into evidence testimony regarding pills found on the Defendant at the time of his arrest; (4) the trial court erred by allowing a State's witness to read to the jury a summary of the witness's pre-trial statement to police; (5) the trial court erred by denying the Defendant's request to introduce a prior recorded statement of an unavailable witness to impeach a State's witness; (6) the trial court erred by not clarifying its jury charge that the jury could not consider evidence introduced at trial concerning the co-defendant; and (7) the trial court erred by ordering the Defendant's sentence for robbery to be served consecutively to his life sentence.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence presented at trial is insufficient to support his convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of the following offenses: robbery; felony murder; and premeditated first degree murder.

### 1. Robbery

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1997). Under Tennessee Code Annotated section 39-11-401(a) (1997), "[a] person is criminally responsible as a party to an

-13-

offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." A person is criminally responsible for an offense committed by the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (1997).

The evidence introduced at trial overwhelmingly shows that the Defendant participated in the robbery of the victim. The evidence showed that intruders bound the victim with a telephone cord and duct tape, gagged him by stuffing paper towels in his mouth and taping his mouth shut with duct tape, placed plastic grocery bags over his head and then sealed the bags with duct tape around his neck. The intruders stole two shotguns, jewelry, prescription drugs, cash, and the victim's new white Oldsmobile. Angela Guy testified that she overheard the Defendant and her husband, Jarret Guy, talking about "making some money," and the Defendant "mentioned that he knew where to make some money. A friend of his grandfather's kept large sums of money because he didn't believe in banks. . . . He mentioned that he was an old man." Angela Guy testified that the Defendant stated that the victim lived in the Englewood area near a Kroger's grocery store. She stated that the Defendant told her husband that the victim had "anywhere from twenty-five to fifty thousand dollars. It was a large sum." She said that the Defendant stated that the victim would go grocery shopping every Monday and "that he usually stayed gone about three hours."

Angela Guy testified that the Defendant and her husband left the apartment on July 16, 2000, and at about 3:00 or 4:00 p.m., "Jarret [Guy] called and said he was going to go to Kroger's. . . . That meant that they were going to go break into the house." She stated that the Defendant and Jarret Guy returned to her home later that day in a new white Oldsmobile and that they ran back and forth taking property out of the car, including guns, money, pills, shotgun shells and bullets. She explained that the Defendant and Jarret Guy discussed which items they could sell to make the most money and that they split a large amount of cash between them. McEwen, Sr., testified that the Defendant and Jarret Guy drove to his house in a white Oldsmobile and tried to sell him the victim's two shotguns. Campbell stated that the Guy family and the Defendant arrived at her home in a new white Oldsmobile that she did not recognize. She testified that, while the Defendant and the Guy family spent the night at her house, she found several guns and some jewelry that did not belong to her under her kitchen sink. She stated that those items were gone the next day, after the Defendant and the Guy family left. Police officers found the white Oldsmobile at the Super 8 Motel in Goodlettsville with Jarret Guy in the driver's seat. Police then arrested the Defendant in a motel room where police found two of the victim's handguns and a folded towel containing the victim's jewelry. Andrew Parker, who was the Defendant's roommate for a few days at the Criminal Justice Center in Nashville, testified that the Defendant confessed to him that he had robbed and murdered the victim.

The evidence established that the Defendant participated in the robbery of the victim, split some of the proceeds of the robbery, and then tried to sell some of the stolen goods. The Defendant was arrested in a motel room where police found some of these stolen goods. Accordingly, after viewing this evidence in the light most favorable to the prosecution, we conclude that a rational trier

of fact could have found the essential elements of robbery beyond a reasonable doubt.

## 2. Felony Murder

Felony first degree murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn Code Ann. § 39-13-202(a)(2) (1997 & Supp. 2002). No culpable mental state is required for conviction of felony murder except the intent to commit the enumerated offenses or acts in subdivision (a)(2). Tenn. Code Ann. § 39-13-202(b).

As explained above, the evidence introduced at trial overwhelmingly supports the Defendant's conviction for robbery. The evidence shows that the victim was killed by manual strangulation and suffocation after the robbers bound and gagged the victim using a telephone cord and duct tape, placed plastic grocery bags over the victim's head and sealed the bags to the victim's neck using duct tape. Police found the victim's body in the basement of his home, covered by an old mattress and rubbish. Dr. Levy testified that the victim's bruises and abrasions indicated that the victim had been severely beaten and possibly dragged down some stairs. Andrew Parker testified that the Defendant confessed to him that he robbed and murdered the victim. The evidence clearly shows that the victim was killed while the Defendant and Jarret Guy robbed him of his car, guns, jewelry, cash and prescription drugs. Accordingly, after viewing this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of felony murder beyond a reasonable doubt.

## 3. Premeditated First Degree Murder

Premeditated first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Premeditation "may be established by proof of the circumstances surrounding the killing." Suttles, 30 S.W.3d at 261. The Tennessee Supreme Court noted that there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id.; see Bland, 958 S.W.2d at 660.

As explained above, the evidence was overwhelming that the Defendant participated in the robbery of the victim. Andrew Parker testified that the Defendant confessed to him that he robbed and murdered the victim. Parker explained, "[The Defendant] said something about a plastic bag

-15-

being put over his head or something like that. And there was mention of tape, duct tape. And if I'm not mistaken, he said he threw him down the stairs into a basement, or something like that." He stated that the Defendant told him, "I broke that old man's neck." Parker testified that the Defendant also mentioned Jarret Guy was with him at the time of the murder. He stated that the Defendant told him that they selected the victim "[b]ecause they knew him. There was supposed to have been quite a bit of money and some pills, pain medication." Parker testified that the Defendant told him that, after they killed the victim, "they went to a motel room and were doing drugs until they got caught." Parker said that the Defendant told him that they stole some money, prescription drugs and the car from the victim. Angela Guy testified that the Defendant and Jarret Guy discussed plans to rob the victim because the victim was elderly and reportedly had a large amount of cash in his home. She stated that the Defendant told Jarret Guy that the victim's house was located near a Kroger's grocery store in east Nashville and that the victim had a habit of going to the grocery store on Mondays.

Dr. Levy testified that the victim was killed by manual strangulation and suffocation. The evidence showed that the Defendant and Jarret Guy bound the victim's hands and ankles with a telephone cord and duct tape, stuffed his mouth with a wad of paper towels, taped his mouth with duct tape, placed a plastic grocery bag over his head and sealed the bag around his neck with duct tape. This manner of killing the victim shows that it was "an act done after the exercise of reflection and judgment" because strangling a person around the neck and then sealing plastic bags over the person's head with duct tape are acts certain to cause death. Accordingly, after viewing this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of premeditated first degree murder beyond a reasonable doubt.

### B. Crime Scene Photographs of Victim

The Defendant next contends that the trial court abused its discretion by admitting into evidence crime scene photographs of the murder victim. The Defendant argues:

> In this case, photographs involving close-ups of the murder victim's face were introduced over [the Defendant's] objections. (Ex. 17-A-I). Other photographs that were not as gruesome and inflammatory had already been introduced, as had testimony concerning the victim's death. The photographs that were objected to by [the Defendant] were not necessary to prove any element of the State's case, and were therefore irrelevant. Given the other evidence that the jury had already heard, and the lack of probative value of these particular photographs, their introduction by the State was simply an attempt to inflame the jury by showing them a close-up of the deceased victim's face.

The State contends that the photographs were offered to prove premeditation and felony murder and that the photographs' probative value was not outweighed by the potential prejudicial effect on the Defendant. Moreover, the State argues that the Defendant's failure to include the photographs on appeal prevents this Court from reviewing the photographs at issue.

The determination of the admissibility of photographs lies within the sound discretion of the trial court. State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992); State v. Evans, 838 S.W.2d 185, 193 (Tenn. 1992); see Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 4.01[17][a], at 4-36 (4th ed. 2000). The decision of the trial court to admit a photograph into evidence "will not be overturned on appeal absent a clear showing of an abuse of discretion." State v. Vann, 976 S.W.2d 93, 103 (Tenn. 1998); see State v. Cazes, 875 S.W.2d 253, 262-63 (Tenn. 1994). To be admissible, a photograph must be relevant to some issue at trial and the danger of unfair prejudice, confusion of the issues, or misleading the jury must not substantially outweigh its probative value. Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); see Cohen, *supra*, § 4.01[17][d], at 4-38. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. This Court has explained that:

> Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror." Murder is an absolutely reprehensible crime. Yet our criminal justice system is designed to establish a forum for unimpaired reason, not emotional reaction. Evidence which only appeals to sympathies, conveys a sense of horror, or engenders an instinct to punish should be excluded.

State v. Collins, 986 S.W.2d 13, 19-20 (Tenn. Crim. App. 1998) (citations omitted). In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). Before any photograph can be admitted into evidence it must be verified and authenticated by a witness with knowledge of the facts. Banks, 564 S.W.2d at 949-50; see Cohen, *supra*, § 4.01[17][e], at 4-38.

After thoroughly reviewing the record in this case, we note that, according to the certificate of appellate record filed by the Davidson County Criminal Court Clerk, the exhibits admitted into evidence at trial are logged with the case State v. Jarret Alan Guy, No. M2002-02473-CCA-R3-CD, which is pending in this Court. It is the duty of the Defendant to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of his appeal. Tenn. R. App. P. 24(b); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983); State v. Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997); State v. Hopper, 695 S.W.2d 530, 537 (Tenn. Crim. App. 1985). Generally, when the record is incomplete, or does not contain the proceedings relevant to an issue, this Court is precluded from considering this issue. Gibson, 973 S.W.2d at 244; Hopper, 695 S.W.2d at 537; State v. Morton, 639 S.W.2d 666, 668 (Tenn. Crim. App. 1982). The Defendant failed to ensure that the appellate record in this case contained collective Exhibit 17, A-I. However, the photographs of the victim at issue in this case are filed with the appellate record in the pending case of State v. Jarret Alan Guy, No. M2002-02473-CCA-R3-CD, and the record is unclear as to whether the Defendant's counsel knew that the photographs were not filed in the appellate record of this case. Further, this Court may take judicial

notice of records on file. See Tenn. R. App. P. 13(c); Givens v. State, 702 S.W.2d 578, 579-80 (Tenn. Crim. App. 1985). Therefore, in the interests of judicial economy, we elect to review the photographs in collective Exhibit 17, A-I, to determine whether the trial court abused its discretion by admitting them.

Defendant's counsel objected to the introduction of the photographs of the victim's body, stating, "I want to object to the introduction of the next set of photographs, which are just photographs of the body, unless [the State] can demonstrate how those photographs are relevant to the identity of [the Defendant] being the person who committed the crime. Clearly, [the victim] was killed." The trial court overruled the objection, stating:

> The pictures are not pleasant to look at, Mr. Weatherly. I agree with you. And obviously, they're a little rough, but I think the state has the burden of proof to prove their case, premeditation is an element of one count. And as far as the felony murder, it relates to that, to some extent, too. And I'm going to respectfully overrule your . . . objection. And the state can use these under the rules and under the case law in this state. The probative value outweighs the prejudice, I believe.

The trial court allowed the State to introduce the following photographs in collective Exhibit 17: (A) Photograph of victim's ankles bound with telephone cord and duct tape; (B) Photograph of victim's body next to a basement wall with his shirt partly pulled up and a plastic grocery bag over his head; (C) Close-up photograph of victim's head covered by a plastic grocery bag and duct tape; (D) Close-up photograph of victim's head covered by a plastic grocery bag and duct tape with a wad of paper towels stuck to it; (E) Photograph of victim's upper body with his head covered by a plastic grocery bag and duct tape over his mouth with a wad of paper towels stuck to it; (F) Close-up photograph of victim's head showing bruises and marks on the victim's neck; (G) Photograph of victim's body showing victim's arm behind his back; (H) Photograph of victim's wrists tied together with a telephone cord; and (I) Photograph of victim's ankles tied together with telephone cord and duct tape. The Defendant contends that these photographs unfairly prejudiced him because they were introduced in "an attempt to inflame the jury." The Defendant further contends that the photographs "were not necessary to prove any element of the State's case, and were therefore irrelevant." We respectfully disagree with the Defendant's assertions.

After thoroughly reviewing the photographs contained in Exhibit 17, we conclude that the trial court did not abuse its discretion by admitting these photographs into evidence. First, the photographs were relevant to prove intent and premeditation, elements which may be inferred from the manner and extent of the attack on the victim. The photographs that show the victim's ankles and wrists bound with telephone cord and duct tape indicate that the victim was restrained before being killed. The photographs that show the victim's head covered with plastic grocery bags and wrapped with duct tape indicate that the killing was premeditated. The photograph that shows the bruises and marks on the victim's neck indicates that the victim was also strangled. The photographs that show a wad of paper towels stuck to a strip of duct tape near the victim's mouth indicate that the victim was gagged before being killed. A police officer who was at the crime scene when the

photographs were taken explained to the jury what each photograph depicted. The photographs were not particularly gruesome because there was virtually no blood and most of the victim's face was covered by the plastic bags. All the photographs in Exhibit 17 had probative value that was not substantially outweighed by unfair prejudice. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the photographs of the victim.

### C. Defendant's Pills

The Defendant next contends that the trial court erred by admitting into evidence testimony regarding pills found on the Defendant at the time of his arrest. Officer Hutchinson stated that, once he and the other officers entered the Defendant's motel room, he frisked the Defendant before placing him under arrest. The officer explained that he found some red pills in the Defendant's left front pocket. The Defendant objected to the introduction of the pills into evidence, but the trial court overruled the objection and admitted the pills "for whatever purpose," stating that the pills found on the Defendant related to earlier testimony about pills brought in from the white Oldsmobile. The Defendant contends:

> The [S]tate did not provide any foundation for the relevancy of that evidence, nor was that evidence later identified as having any connection to the charges for which [the Defendant is] on trial. The State clearly introduced that evidence as a wrong-doing by [the Defendant], in violation of Rule 404 of the Tennessee Rules of Evidence. Further, any alleged relevancy of that evidence was substantially outweighed by the risk of unfair prejudice to the [Defendant].

The State argues that the red pills found on the Defendant were relevant and "not necessarily evidence of wrongdoing."

In Tennessee, admissibility of evidence is within the sound discretion of the trial judge. State v. Saylor, 117 S.W.3d 239, 247 (Tenn. 2003). The determination of whether proffered evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left to the sound discretion of the trial judge, as is the determination of whether the probative value of evidence is substantially outweighed by the possibility of prejudice pursuant to Tennessee Rule of Evidence 403. State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)); State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993). We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his discretion. State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." See Forbes, 918 S.W.2d at 449. In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Cohen, *supra*, § 4.01[4],

at 4-8. After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "'Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.'" James, 81 S.W.3d at 757-58 (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)).

After thoroughly reviewing the record, we conclude that the trial court did not abuse its discretion by admitting into evidence the bottle of red pills found on the Defendant. Both Angela Guy and Nora Campbell testified that Jarret Guy and the Defendant brought drugs and pills into their homes. Campbell testified that she believed the drugs were "Mepergan and either Xanax or Valium." Angela Guy testified that the Defendant and Jarret Guy brought "merchandise" from the victim's house into her home, including "some shotgun shells, bullets, pills." She stated that some of the pills included nitroglycerine pills, though she noted that "there was a bunch of pills." Neither Campbell nor Angela Guy described the color of the pills that the Defendant and Jarret Guy were bringing into the homes. We agree with the trial court that the red pills found on the Defendant in the motel room were relevant because they showed that the Defendant was in possession of an item, or items, similar to those taken from the victim's house. The probative value of the pills was not substantially outweighed by unfair prejudice because the pills were not identified as illegal drugs. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the red pills.

### D. Andrew Parker's Prior Consistent Statement

The Defendant next contends that the trial court erred by allowing Andrew Parker to read to the jury a summary of his pre-trial statement to police. The Defendant argues:

> That statement was consistent with the testimony he had already given at trial concerning an alleged "jail house confession" by [the Defendant]. There was no insinuation by [the Defendant's] counsel that the witness had recently fabricated his testimony, or any other reason that the witness' prior statement should have been admitted into evidence. Therefore, the trial court erred by allowing this witness to read the prior statement.

The State contends that the Defendant's counsel "attempted to discredit Mr. Parker's credibility and insinuated that Mr. Parker was giving false testimony. By counsel's questions, counsel suggested that Mr. Parker fabricated his testimony from a police report or from other information given him by prosecutors." The State argues that the trial court properly admitted Parker's prior statement to police as a prior consistent statement.

The Defendant's counsel cross-examined Parker by asking him whether the prosecutors showed him a copy of a police report which contained his statement to detectives in August of 2000.

Parker replied that he "looked over the notes from the interview" so he could refresh his recollection about what he told the detectives. The Defendant's counsel then showed him a copy of the police report, and Parker confirmed that it was the police report that the State showed him before testifying. Parker stated that the copy he reviewed contained handwritten notes that the detectives made as he gave his statement. The Defendant's counsel then asked Parker specific questions about the statement he gave to police, including whether Parker told detectives that "these men had gone up and knocked on the door at [the victim's] house," that the victim was sitting outside in a chair when the two men arrived at the victim's house, and that the victim "was tied to a chair inside the house" before the Defendant and Jarret Guy killed the victim. On re-direct examination, the State asked Parker to read the statement he previously gave to police in August of 2000. The Defendant objected to Parker reading the statement into evidence, but the trial court overruled the objection because the Defendant showed Parker the statement on cross-examination and questioned him about it. The State then introduced the statement into evidence.

Generally, it is impermissible to corroborate a witness' testimony by evidence of the witness making prior consistent statements, absent an impeaching attack on that testimony. State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998); State v. Hodge, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993); see State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980). However, "'prior consistent statements may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied.'" Hodge, 989 S.W.2d at 725 (quoting State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988)). Before prior consistent statements may be admissible, "the witness' testimony must have been assailed or attacked to the extent that the witness' testimony needs rehabilitating." Id. (citing Benton, 759 S.W.2d at 434)). Prior consistent statements also may be admissible when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness' testimony was either fabricated or based upon faulty recollection. Meeks, 867 S.W.2d at 374. Moreover, "the impeaching attack which allows for corroboration may occur during cross-examination of the witness . . . . Under such circumstances, the [witness'] statement made before the inconsistent statement but which was consistent with his trial testimony" is admissible to rehabilitate the witness. Id. Finally, prior consistent statements may be admissible when a witness' prior statement is used out of context to cross-examine the witness. State v. Boyd, 797 S.W.2d 589, 593-94 (Tenn. 1990).

In the case under submission, the Defendant's counsel cross-examined Parker about the statement he gave to police in August of 2000 and handed Parker a copy of the police report that summarized the detectives' interview with Parker. The Defendant's counsel asked Parker specific questions regarding the police report, including whether Parker told police that the Defendant told him "that these men had gone up and knocked on the door at [the victim's] house" and that the Defendant and the other man tied the victim to a chair inside the house. Parker did not mention either of these facts on direct examination. Through this line of questioning, the Defendant's counsel insinuated that Parker's testimony about what the Defendant told him in the jail cell came from the police report and not from his memory. Parker's prior consistent statement given to police in August of 2000 was admissible because the Defendant's counsel insinuated that Parker recently fabricated

his testimony by reading the police report containing his statement. Parker's testimony was assailed or attacked by the Defendant's counsel to the point that it needed to be rehabilitated. Moreover, the Defendant's counsel opened the door for the police report to come in because he questioned Parker about reading the police report before trial, showed him the police report during cross-examination and asked Parker about specific details from the report. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the police report containing the summary of Parker's prior consistent statement.

### E. Statement of Unavailable Witness

The Defendant next contends that the trial court erred by denying his request to introduce a prior recorded statement of Brian Bryant, an unavailable witness, that would have impeached the testimony of Angela Guy. Because the trial court excluded this evidence, the Defendant argues that he was denied his constitutional right to present a complete and competent defense. The State argues that the prior recorded statement of the unavailable witness was not admissible because the statement did not qualify for any hearsay exceptions under Tennessee Rule of Evidence 804.

The Defendant attempted to introduce a video of a police interview with Bryant, the man that Angela Guy said the Defendant and Jarret Guy attempted to recruit to participate in the robbery of the victim. The Defendant's investigator could not locate Bryant and therefore could not subpoena him to testify at trial. The Defendant claimed that the video would show Bryant contradicting Angela Guy's testimony because Bryant told police that Angela Guy called him weak and not up to the task of robbing the victim and said that he would not be back. The Defendant also claimed that Bryant told police that the Defendant did not speak while Jarret Guy was attempting to recruit Bryant. The trial court denied the Defendant's request to introduce the video of the police interview with Bryant because it did not fall within any exception to the rules of evidence and the Defendant cross-examined Angela Guy on this very issue.

Tennessee Rule of Evidence 804 is an exception allowing admission of otherwise inadmissible hearsay that applies only if the declarant of the hearsay statement is unavailable at the time of trial. Tennessee Rule of Evidence 804(a)(5) states that a declarant will be deemed unavailable if the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Once the declarant has been deemed unavailable under Tennessee Rule of Evidence 804(a), the next step is to determine whether the statement falls into one of the five hearsay exceptions in Tennessee Rule of Evidence 804(b). In order for the declarant's statement to be admissible, the statement must be either former testimony, a dying declaration, a declaration against interest, a declaration of pedigree or a statement offered against a party that has wrongfully procured the unavailability of the declarant as a witness. Tenn. R. Evid. 804(b)(1), (2), (3), (4) & (6).

In the case under submission, the Defendant satisfied Tennessee Rule of Evidence 804(a) because Bryant was absent from the trial and the Defendant was unable to procure his attendance by process. However, the Defendant did not satisfy Tennessee Rule of Evidence 804(b) because Bryant did not make his statement while dying or injured, nor did he speak against his own pecuniary or proprietary interest by making the statement. See Tenn. R. Evid. 804(b)(2), (3). The Defendant claims that the video tape showed Bryant telling police what he knew about the victim's murder.[1] Moreover, the statement was not given at a hearing, and there was no opportunity for either party to develop or cross-examine his statement. Tenn. R. Evid. 804(b)(1). Accordingly, the statement was not former testimony under Tennessee Rule of Evidence 804(b)(1) and thus does not fall within the ambit of Tennessee Rule of Evidence 804. Also, we note that the Defendant's counsel vigorously cross-examined Angela Guy about the statements she allegedly made about Bryant. Therefore, we conclude that the trial court did not abuse its discretion by excluding the video tape of Bryant's statement to police because it was inadmissible hearsay.

## F. Jury Instructions

The Defendant next argues that the trial court erred by not clarifying its jury charge that the jury could not consider evidence introduced at trial concerning the co-defendant, Jarret Guy. In the original three count indictment, the Defendant and Jarret Guy were named together as defendants because the State contemplated a joint trial. However, the trial court ordered that the defendants be severed because it felt that a severance would "better serve to promote justice and fairness in this case." In the trial court's charge to the jury, the trial court stated:

> The indictment in this case also charges the defendant, JARRET ALAN GUY, with the same offense as to each respective Count listed above; however, a severance has been granted as to this defendant, and you are to only consider the law and the evidence as it pertains to the defendant, JACOB EDWARD CAMPBELL, in this trial.

The Defendant made the following objection to this instruction:

> Your Honor, my objection is that the way that is phrased, it could be misleading to the Jury as to what they consider or can consider as the evidence in this case. It, basically, tells them they can't consider any evidence about Jarret Guy. But that's extremely important to the issue of identity, as we've presented it. I'd like to request the Court to recall the Jury and give them an additional instruction that would state that the Jury can consider the evidence introduced regarding Jarret Guy for the purpose of determining the identity of the person who committed this offense or the

---

[1]We note that the Defendant failed to include the video tape of the Bryant interview in the appellate record.

role of the person in the offense.

The trial court overruled the objection, stating:

> I don't think it's necessary. I think they can consider anything that relates to the defendant, Jarret Guy, and all of the other instructions in this . . . forty-five paged indictment. I think what I'm saying to the Jury is that they will need only to decide for the purpose of this trial the law and evidence relating to the defendant, Campbell, in their verdict.

Generally, "a defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a complete charge of the law applicable to the facts of the case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). Furthermore, the trial court must describe and define all of the elements of each offense. State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). When jury instructions are full, fair, and accurate statements of the law, a trial court is not required to provide special instructions. State v. Mann, 959 S.W .2d 503, 521 (Tenn. 1997); State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984); State v. Chestnut, 643 S.W.2d 343, 352 (Tenn. Crim. App. 1982). It is not error for a trial court to deny a request for special instructions when the court's instructions on a matter are proper. State v. Vann, 976 S.W.2d 93, 114 (Tenn. 1998).

After reviewing the jury instruction at issue in this case, we conclude that the trial court did not err by denying the Defendant's request for a special instruction because the trial court's instruction regarding the indictment and Jarret Guy was correct. The trial court instructed the jury that, even though co-defendant Jarret Guy was listed in the indictment, "you are to only consider the law and the evidence as it pertains to the defendant, JACOB EDWARD CAMPBELL, in this trial." This instruction clearly told the jury that the Defendant, not Jarret Guy, was on trial in this case and that, therefore, it should only consider the law and the evidence as it pertained to the Defendant. We conclude that this instruction needed no clarification and that the trial court properly denied the Defendant's request for a special instruction.

## G. Sentencing

The Defendant next contends that the trial court erred by ordering the sentence for robbery to be served consecutively to the Defendant's life sentence for murder. At the sentencing hearing, the State introduced the Defendant's pre-sentence report into evidence. After hearing arguments from the State and the Defendant, the trial court applied the following enhancement factors under Tennessee Code Annotated section 40-35-114 (2003): (2) the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (5) the victim of the offense was particularly vulnerable because of age or physical or mental

disability; (6) the Defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; and (14) the felony was committed while the Defendant was on probation. The trial court stated that it did not find any mitigating factors "that would, in any way, reduce the enhanced factors," and it imposed the maximum sentence of ten years for the robbery conviction. The trial court also found that the ten year sentence should run consecutive to the Defendant's life sentence under Tennessee Code Annotated section 40-35-115(b) (2003) because "[the Defendant's] record of criminal activity is, obviously, extensive," and the crime was "a particularly brutal murder of a defenseless, older gentleman, living in his own home."

When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999)); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 400-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2003), Sentencing Commission Cmts.

Tennessee Code Annotated section 40-35-103(1) (2003) states that:

Sentences involving confinement should be based on the following considerations:
(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant

should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). The trial court may consider enhancement and mitigating factors when determining a defendant's sentence. See Tenn. Code Ann. §§ 40-35-113, -114 (2003). Moreover, if a defendant is convicted of more than one criminal offense, the trial court may order the sentences to run either consecutively or concurrently. Tenn. Code Ann. § 40-35-115(a). The trial court may order the sentences to run consecutively if the court finds by a preponderance of the evidence that certain criteria are met. See Tenn. Code Ann. § 40-35-115(b)(1)-(7). If the court finds that the criteria in Tennessee Code Annotated section 40-35-115(b) are not met, sentences shall be ordered to run concurrently. Tenn. Code Ann. § 40-35-115(d).

In the case under submission, the Defendant argues that the trial court erred by applying the enhancement factor that the Defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense because "it was the alleged acts of cruelty that caused the victim's death."[2] Tenn. Code Ann. § 40-35-114(6). We disagree with the Defendant's assertion. The evidence showed that the Defendant and his accomplice bound the victim's hands and ankles with a telephone cord and duct tape, stuffed his mouth with a wad of paper towels, taped his mouth with duct tape, placed a plastic grocery bag over his head and sealed the bag around his neck with duct tape, causing the victim's death. Dr. Levy testified that the victim had a variety of blunt force injuries on his head, portions of his chest, abdomen, back, arms and legs. He explained that the victim's injuries were caused by the victim being struck by an object or the victim being thrown down and striking the object. Dr. Levy also stated that the victim had been manually strangled, which contributed to his death. This evidence shows that the victim was treated with "exceptional cruelty" during the commission of the robbery. We conclude that the trial court did not err by applying this enhancement factor and the other enhancement factors to the Defendant.

The Defendant also argues that the trial court erred by ordering that the Defendant's robbery sentence run consecutively to his life sentence because "there was no evidence that [the Defendant's] record of criminal activity was extensive." We disagree with the Defendant's assertion because his pre-sentence report shows that his record of criminal activity is extensive. The Defendant was convicted of the following offenses: possession of drugs in May of 2000; driving while his license was suspended in May of 2000; possession of narcotics equipment in April of 2000; selling drugs in August of 1998; assault in May of 1998; disorderly conduct in May of 1998; assault in November of 1996; driving under the influence of an intoxicant in May of 1996; aggravated assault in August 1995; assault in May 1995; weapons offense in June of 1995; selling drugs in March of 1995; and possession of narcotics equipment in March of 1995. Therefore, the Defendant clearly satisfied Tennessee Code Annotated section 40-35-115(b)(2), and, accordingly, we conclude that the trial court did not err by ordering that the ten year robbery sentence be served consecutively to the Defendant's life sentence.

---

[2]We note that the Defendant does not contest on appeal any of the other enhancement factors that the trial court applied to the Defendant.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we AFFIRM the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE